Estate of J. W. Haltiwanger, Deceased, Susie S. Haltiwanger, as Executrix of the Last Will and Testament of J. W. Haltiwanger, Deceased v. Commissioner.
Estate of J. W. Haltiwanger, Deceased v. Commissioner
Docket No. 4469.
United States Tax Court
1945 Tax Ct. Memo LEXIS 339; 4 T.C.M. (CCH) 48; T.C.M. (RIA) 45017; January 18, 1945
*339 Clarke W. McCants, Esq., 502 Carolina Life Bldg., Columbia, S.C., for the petitioner. Edward L. Potter, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: Respondent has determined a deficiency in income tax against petitioner for the year 1941 in the amount of $8,077.14. The only issue is whether Susie S. Haltiwanger, wife of J. W. Haltiwanger, now deceased, from and after July 1, 1941, owned a 20 percent interest in a partnership, or whether such 20 percent interest was that of her husband. Findings of Fact During 1941 J. W. Haltiwanger was a resident of Columbia, South Carolina, and was engaged in a retail ladies' ready-to-wear business. He filed his income tax return for 1941 with the Collector of Internal Revenue for the District of South Carolina. Haltiwanger died on October 19, 1942, and his wife, Susie S. Haltiwanger, is the duly qualified executrix of his estate. Haltiwanger and Susie Summer were married on October 25, 1905, in Newberry, South Carolina. At that time Haltiwanger had started a mercantile business in Newberry. Through his wife, he borrowed approximately $4,500 from his father-in-law, Charles S. Summer, *340 with which he financed his original business. Subsequently, Haltiwanger repaid the loan. Mrs. Haltiwanger had specialized in music, having studied in London for two years, and just prior to her marriage, had taught music in Presbyterian College, Charlotte, North Carolina. In 1906 she served as a substitute teacher for several weeks at the college. Upon returning to Newberry she learned that her husband had some unpaid bills, made in acquiring his education, and she used the money received from teaching for paying those bills. She thereafter taught music and served as organist in a church in Newberry for several years. In 1913 Haltiwanger moved his family and business to Columbia. Over the years Mrs. Haltiwanger helped in the decoration of the show windows, particularly at such times as Easter and Christmas. In the earlier years she went to the store nearly every day, and assisted in making out her husband's bills and posting the books at the end of the month. She accompanied Haltiwanger, who had never been to New York, on his first buying trip there. She continued to go with him on such trips throughout the following years. These trips were usually made twice a year. On some occasions *341 she would go to different houses alone and make purchases. On the New York trips she combined pleasure with business. In 1920 Haltiwanger's store was burned and a big loss was suffered. After the fire, Mrs. Haltiwanger served as a clerk for a while. In addition to holding a position as organist and giving piano lessons, she rented rooms and served boarders. Her income from these activities was about $125 per month, out of which she operated the home and turned over to her husband the balance of the proceeds to be used in his business. She did this until his business was re-established. There was no agreement with her husband for compensation, and she received none for any of the services she had rendered at the store. She did whatever she could to help, and felt that what was hers was his and what was his was hers. Two sons, J. W. Haltiwanger, Jr., and Charles S. Haltiwanger, were born of their marriage, and are now 34 and 27 years of age, respectively. The elder son worked in the store twelve years, and the younger one four years, before going into the armed services. J. W. Haltiwanger, Jr., helped with the books until his father's illness, eight years ago, after which he assisted *342 with the buying and in managing the business. Charles S. Haltiwanger, after graduating from college, worked in the store and was interested in the different departments. He supervised the second floor. Both sons were married and were paid salaries in 1939, 1940 and for the first six months of 1941, as follows: January 1 to
June 30,
1939
1940
1941
J. W. Haltiwan-
ger
$5,022.03
$7,054.25
$2,425.00
Charles S. Halti-
wanger
1,414.58
2,141.25
1,600.00
On July 10, 1941, a partnership agreement was signed by the four Haltiwangers, the provisions of which are as follows: "This agreement, made by and between J. W. Haltiwanger, Sr., J. W. Haltiwanger, Jr., Charles S. Haltiwanger and Susie Summer Haltiwanger, all of the City of Columbia, County of Richland, State aforesaid, "WITNESSETH: "That the said parties hereby for themselves and their respective heirs, executors and administrators, and assigns agree to become partners in the mercantile business, under the firm name of HALTIWANGER'S, effective from the 1st day of July, 1941, upon the terms and condtions hereinafter stated: "1. That the business shall be carried on at 1441 Main *343 Street, in the City of Columbia, County and State aforesaid, on which premises the same is now being carried on, or any other place they may hereafter mutually agree to rent for their purposes. "2. That the assets appertaining to the mercantile business now owned individually by J. W. Haltiwanger, Sr., are, namely: Cash on Hand
$ 1,498.32
Cash in South Carolina National
Bank
9,810.18
Accounts Receivable
41,448.87
Merchandise, consisting chiefly
of: Women's Coats and Suits
2,778.25
Women's Dresses
6,450.45
Women's Fur Coats
1,080.00
Women's Hats
830.45
Women's Blouses, Hose, Gloves,
etc.
4,131.02
Children's Dresses, Coats, Un-
derwear, etc.
5,609.00
Women's Underwear
7,924.65
Women's Corsets
2,098.96
Furniture and Fixtures, consist-
ing chiefly of: Racks, Counters, Show Cases,
Tables, Three Typewriters, Two
Adding Machines, One Posting
Machine. One Safe, Four Desks,
Four Sewing Machines, Four
Cash Registers, Removable Por-
tion of Air Conditioning Plant,
Removable Portion of Elevator
and all other furniture, fixtures
and merchandise of whatsoever
kind and description located in
the store room at 1441 Main
Street
19,775.98
Improvements to Leased Build-
ing, consisting chiefly of: Non-removable Air Condition-
ing Equipment, Elevator
Shaft, Lights, Curtain Walls,
Flooring and General Im-
provements
12,605.97
Automobile: Buick Coupe, Motor Number
5401205
1,249.50
Account of J. W. Haltiwanger, Jr.
3,125.00
Account of Charles S. Haltiwan-
ger
3,125.00
Prepaid Licenses
135.00
Total Assets
$123,667.50
*344 and for and in consideration of the sum of One and No/100 ($1.00) Dollar, and in further consideration of the valuable services rendered to him in connection with the said mercantile business over a period of ten years by the other partners, the said J. W. Haltiwanger, Sr., does hereby grant, bargain, sell, assign, transfer, and deliver unto the co-partnership composed of J. W. Haltiwanger, Sr., J. W. Haltiwanger, Jr., Charles S. Haltiwanger and Susie Summer Haltiwanger, the said personal property and they are hereby declared to each own a proportionate interest in these assets of the said partnership and to share in the profits and losses of the said partnership on the following respective bases: J. W. Haltiwanger Sr.
40%
J. W. Haltiwanger, Jr.
22 1/2%
Charles S. Haltiwanger
17 1/2%
Susie S. Haltiwanger
20%
"3. That the following is ta rue and correct statement of the liabilities now owing by J. W. Haltiwanger, Sr., as an individual, trading under the name of HALTIWANGER'S: Accounts Payable
$14,836.74
Reserve for 1941 Taxes
1,201.19
Reserve for Depreciation
13,293.25
J. W. Haltiwanger, Sr., Draw-
ing account
3,291.15
Total Liabilities
$32,622.33
*345 and in consideration of the transfer and delivery of said assets to them and in further consideration of the sum of One and No/100 ($1.00) Dollar, paid by the said J. W. Haltiwanger, Sr., J. W. Haltiwanger, Jr., Charles S. Haltiwanger and Susie Summer Haltiwanger, as a co-partnership, trading under the firm name and style of HALTIWANGER'S, do hereby assume the payment of these liabilities and obligations on the following respective bases: J. W. Haltiwanger Sr.
40%
J. W. Haltiwanger, Jr.
22 1/2%
Charles S. Haltiwanger
17 1/2%
Susie S. Haltiwanger
20%
"4. That the parties composing this partnership shall have monthly drawing accounts as follows: "J. W. Haltiwanger, Sr., One Thousand and No/100 ($1,000.00) Dollars and in addition thereto any further amounts as may be agreed upon by the other partners including any amounts as may be required to pay income taxes, all of which shall be charged to his account on the books of the firm. "J. W. Haltiwanger, Jr., Three Hundred and No/100 ($300.00) Dollars and in addition thereto any further amounts as may be agreed upon by the other partners including any amounts as may be required to pay income taxes, all of which *346 shall be charged to his account on the books of the firm. "Charles S. Haltiwanger, Two Hundred and No/100 ($200.00) Dollars, and in addition thereto any further amounts as may be agreed upon by the other partners including any amounts as may be required to pay income taxes, all of which shall be charged to his account on the books of the firm. "Susie Summer Haltiwanger, One Hundred and No/100 Dollars, and in addition thereto any further amounts as may be agreed upon by the other partners including any amounts as may be required to pay income taxes, all of which shall be charged to her account on the books of the firm. "5. That none of the partners shall, during the continuance of the partnership, carry on or be concerned or interested, directly or indirectly, in the same kind of business as that carried on by said partnership, nor be engaged in or undertake any other trade, or business, without the consent in writing of the other partner. "6. That no partner nor partners shall hire or dismiss, except in case of gross misconduct, any clerk or other person in the employment of the partnership, without the consent of the other partners. "7. That during the continuance of their *347 said partnership, none of the said partners shall indorse any note, or otherwise become surety for any person or persons whomsoever or firm or firms, or corporation or corporations, without the consent in writing of the other partners. "8. That none of the partners shall do, or willingly suffer to be done, anything whereby, or by means whereof, the stock in trade, capital or property of the partnership may be attached or taken on execution. "9. That each partner shall, upon every reasonable request, give to the other partners a true account of all transactions relating to the business of the partnership, and full information of all letters, accounts, writings, and other things which shall come into his or her hands or to his or her knowledge concerning the business of the partnership. "10. That each partner shall punctually pay and discharge his or her present and future separate debts and engagements, and shall at all times keep indemnified the other partners, and the property of the partnership, against the same, and all actions, proceedings, claims and demands in respect thereof. "11. That none of the said partners shall, in the course of the said business, without the consent *348 of the others, enter into any contract or engagement, or give credit, or lend any of the partnership moneys, or give any bill, note or security, or contract any debt on account of the said partnership, except in the usual and regular course of the business, and for the benefit thereof; or compound, release, discharge, or postpone any debt, duty or demand due to the said firm. "12. That no partner nor partners shall, without the consent of the other partners, compound, release, or discharge any debt which shall be due and owing to the partnership, without receiving the full amount thereof. "13. That none of the partners shall, without the previous consent in writing of the other partners, assign his or her share or interest in the partnership. "14. That proper books of account shall be kept at the place of business of the firm, in which shall be entered all the dealings and transactions of the said partnership. The said books shall at all times be open to the inspection of all or any of the partners and be kept constantly posted up. "15. That any partner who shall be desirous of selling his or her share and interest in the business shall be at liberty to do so, and shall in *349 such case first offer such share and interest to the other partners for the time being at a price to be named by the selling partner, and if the other partners shall not within ninety (90) days accept such offer, then the selling partner shall be at liberty to sell his or her share and interest to any other person or person at the same or a higher price, but shall not sell the same to any other person at a less price, unless and until it shall have been offered to the other partners for the time being at such less price, and such last mentioned offer shall not have been accepted within ninety (90) days. "16. That all partnership moneys (not required for current expenses) and all securities for money shall as and when received be paid into or deposited in the firm's bank, to the credit of the partnership account. All checks on such account shall be drawn in the firm name and may be so drawn and sign by J. S. Haltiwanger, Sr., J. W. Haltiwanger, Jr., and Charles S. Haltiwanger. "17. That no partner shall pledge the credit of the firm or use any money, goods or effects of the partnership except in the ordinary course of business and upon the account or for the benefit of the partnership. *350 "18. That in the event of the death of any one of the partners, while this contract is in force, it is hereby agreed that the surviving partners shall act as Trustees in behalf of the deceased partner's interest for the purpose of operating the business of HALTIWANGER'S and individually and as Trustees they shall have full and complete power and authority, without any hindrance or interference on the part of any person or persons, to handle and control said business according to their own discretion and judgment until the 31st day of December next following, when they shall be required to render to the estate of the deceased partner a full and true accounting of the operation of said business as of the 31st day of December first following such decease. "19. That in consideration of the additional service rendered as said Trustees, the surviving partners shall be allowed additional compensation at the rate of Three Hundred and No/100 ($300.00) Dollars per month from date of the death of their partner to the said 31st day of December of the same year, said compensation to be paid or credited before the profits of the partnership are determined. "20. That the said surviving partners *351 shall have the right to purchase the interest of the deceased partner in said business at the value shown by the books as of the 31st day of December next following the time of the death of the deceased partner. "21. That the surviving partners, if they elect to purchase the interest of the deceased partner in said business as of the time above mentioned, shall be allowed ninety (90) days from the said 31st day of December for making payment to the estate of the deceased partner, and thereupon the representatives of the deceased partner shall transfer his or her interest therein to the surviving partners. That the surviving partners if they elect to purchase and do purchase the interest in said business, shall have the right to continue the operation of said business under the present firm name and style of HALTIWANGER'S for such time as they may deem it advisable so to do. "22. That the said J. W. Haltiwanger, Sr. shall be the General Manager of the co-partnership composed of the above named parties and trading under the firm name and style of HALTIWANGER'S and as such General Manager shall devote his time during business hours to the business of HALTIWANGER'S and shall use his *352 best endeavors to promote the interest and welfare thereof and shall perform and exercise the powers incident thereto as to him may seem meet and proper. "23. It is further understood and agreed that J. W. Haltiwanger, Sr., as an individual, shall assign and transfer to J. W. Haltiwanger, Sr., J. W. Haltiwanger, Jr., Charles S. Haltiwanger, and Susie Summer Haltiwanger, a co-partnership, trading under the firm name and style of HALTIWANGER'S, the lease to the premises known as 1441 Main Street in the City of Columbia, State of South Carolina. "24. That it is hereby declared and agreed, that if at any time during the continuance of this partnership the said parties shall deem it necessary or expedient to make any alteration in any article, clause, matter, or thing herein contained, for the mere advantageous and satisfactory management of the said partnership business, it shall be lawful for them so to do by any writing under their joint hands indorsed on these articles, or entered in any of the partnership books; and all such alterations shall be adhered to and have the same effect as if the same had been originally embodied in and formed a part of these presents. "25. That it *353 is further understood and agreed that this instrument shall bind the heirs, executors, administrators and assigns of the respective parties hereto. "IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals in quadruplicate this 10th day of July, 1941." The instrument was duly signed and acknowledged in accordance with the laws of South Carolina. As of July 1, 1941, the capital accounts of the partnership show two entries to the credit of each party, as follows: Susie Summer Hal-
tiwanger
$18,211.03 and $414.40
J. W. Haltiwanger,
Sr.
36,422.08 and 831.28
J. W. Haltiwanger,
Jr.
20,487.41 and 467.15
Charles S. Halti-
wanger
15,934.65 and 363.33
On December 31, 1941, there was credited to Mrs. Haltiwanger's capital account $8,462.51, representing 20 percent of the earnings of the partnership for the period July 1 to December 31, 1941. She had made no withdrawals during that period. To the capital account of Haltiwanger, at the end of the year, there was credited $6,974.73, which was in excess of his withdrawals that totaled in the aggregate, $32,1.34.16. J W. Haltiwanger, Jr., was credited with $4,145.32, his withdrawals having been, *354 in addition, $5,375, or a total earning of $9,520.32. Charles S. Haltiwanger's credit was $2,779.60, and his withdrawals $4,625, or total earnings of $7,404.69. The earnings of Haltiwanger's for 1941 so credited to each of the four individuals named was returned as the income of such individual for Federal income tax purposes and the income tax thereon was paid. Prior to the execution of the above instrument, Haltiwanger had told his wife that "he was going to try to make a partnership business" of Haltiwanger's and that "he would like for her to be one of the partners" because of the way she "had helped to make the business what it was." There was no discussion as to the distribution of profits. She thought the profits would go into the business at the end of each year, and that they could take out what was necessary. She understood she could withdraw 20 percent if she wanted it. She did not withdraw anything, as she did not need it. She had some money of her own and Haltiwanger put aside a small amount each month for her which she used for her individual purposes. Haltiwanger paid the household expenses. After execution of the partnership agreement, there was no change in Mrs. *355 Haltiwanger's activities in the business, except that she went to the store every day, while previously she had not gone every day. Her health was not good during the last few years of Haltiwanger's life and she had given up her work in music. During 1941 she did not earn any income from outside sources. After Haltiwanger's death in October 1942, she went to the store, off and on, and helped with the sales until Christmas, when her doctor advised her not to work for a while. She did not know whether any charge was made on the books for her services in the operation of the business, or whether she was credited with any amount therefor. In 1942, Haltiwanger filed a gift tax return on which he reported as gifts to his wife and sons the respective interests in Haltiwanger's set out in the partnership agreement in their names, and paid the gift tax shown on the said return. In his income tax return for 1941, Haltiwanger showed his net income to be $24,525.81, of which $16,925.01 was reported as income from the partnership. The respondent increased the income to the extent of $15,596.97, of which $8,462.51 represented an increase in partnership income, being the amount reported by *356 Mrs. Haltiwanger. In 1944 petitioner conceded that there was a deficiency of $3,547.66, which was paid, leaving the amount of $4,529.58 in controversy. This pertains only to the partnership issue, as the other items of additional income included in respondent's notice of deficiency are not now in dispute. From and after July 1, 1941, Mrs. Haltiwanger was the owner of a 20 percent interest in the partnership operating as Haltiwanger's and of the income attributable to that interest. Opinion We have here a situation where, under the terms of the above agreement, a business formerly owned and operated as a sole proprietorship by J. W. Haltiwanger purportedly became a partnership, composed of J. W. Haltiwanger, Susie S. Haltiwanger, his wife, and their two sons, J. W. Haltiwanger, Jr., and Charles S. Haltiwanger. By the terms of the agreement, J. W. Haltiwanger, "for and in consideration of the sum of One and No/100 ($1.00) Dollar, and in further consideration of the valuable services rendered to him" in the business by the other three individuals, purported to grant, sell and assign to the three individuals named the percentages of the assets of the business thereafter specified *357 and the right to share, in the same proportions, in the profits from its operation. In the same agreement, Susie S. Haltiwanger, J. W. Haltiwanger, Jr., and Charles S. Haltiwanger, "in consideration of the transfer and delivery of said assets to them and in further consideration of the sum of One and No/100 ($1.00) Dollar, paid by the said J. W. Haltiwanger," purported to assume the payment of the liabilities and obligations of the said business according to the percentages of the interests assigned to them. The evidence shows that from the inception of the business in 1906 Susie S. Haltiwanger had from time to time made substantial contributions of services and money, and had received nothing as compensation therefor or as repayment thereof, nor had she ever made any claim to any interest in the business by reason thereof. The record indicates that she and her husband looked upon the business as a family enterprise and that their attitude was that what was his was hers and what was hers was his. This condition continued until July 1, 1941. By that time their two sons had reached maturity, one being about 31 years of age and the other about 24. The elder son had been married for approximately *358 two years, and the younger son married about that time. Both sons were employed in the business and were receiving compensation for the services which they rendered. The elder son had already assumed substantial responsibilities in the management of the business. Such being the circumstances, it was natural and logical, we think, that Haltiwanger should feel that the sons should have proprietary interests in the business, and certainly there was nothing unnatural or illogical, the history of the business being considered, in the conclusion that Susie S. Haltiwanger should have an interest of her own separate and apart from any interest she might already have as his wife, particularly if other parties were to be brought in as partners. The respondent recognizes the above instrument as being effective in so far as the two sons are concerned but denies its effect as to Mrs. Haltiwanger. While not too clearly stated, his argument seems to be that Mrs. Haltiwanger made no contribution of capital or services to the partnership enterprise and was not therefore the owner of the interest in the partnership income attributed to her. He states that there was no gift of the capital interest *359 because the instrument recites that the purported transfer was in consideration of past services, and further, that the recited consideration failed because her services had been only occasional, that no liability therefor had been entered on the books of account and no evidence of any liability had even been given or tendered to her. If the reason given is sound, it is a bit difficult to understand how his conclusion with respect to the interest of the two sons can be justified, for, while it is true that they had worked regularly in the business prior to the date of the transfer here in question, the record shows that they had been compensated for the services rendered and there is nothing to indicate that they had not been fully compensated. Obviously, Haltiwanger looked upon the transfers as gifts, since after the close of the year he reported the amounts transferred and assigned to his wife and sons as gifts in a Federal gift tax return and paid the Federal gift tax thereon. The important thing is whether Susie S. Haltiwanger did in fact become the owner of the interest purportedly transferred and assigned to her, for, if so, she did contribute to the capital of the enterprise *360 and was the owner of the income here in question, and it makes no difference whether the interest in the partnership was acquired by her as a gift from her husband or in consideration for services previously rendered in the business. Neither is it of any importance whether she thereafter performed occasional or regular services in the business, or whether she performed any services at all. From an examination of the partnership agreement and a consideration of the facts surrounding and forming the background for its execution, we are convinced that Haltiwanger intended to, and did, transfer and assign to his wife and two sons as their own, the interests in the assets and business of Haltiwanger's as set out in the partnership agreement. There is nothing in the instrument to indicate, and nothing in the other evidence of record from which the conclusions may be drawn, that any variation in the rights, duties and responsibilities of the various parties to the instrument had as their purpose anything other than the efficient conduct of the business for the best interests of all of the parties thereto. It is true that Haltiwanger remained as general manager and that only he and the two *361 sons had the right to sign checks. Other provisions, however, indicate that they were restricted not only as to the conduct of the business directly, but with respect to their personal affiairs in such a manner as to safeguard for the four partners their respective rights and interests in the business and its welfare. As for control over personnel, no partner nor partners had the power to hire or dismiss employees, except in case of gross misconduct, without the consent of the other partners. No one of the four had any right to engage in any other trade or business without the consent in writing of the other partners. None of the individuals named as partners was permitted to endorse any note or otherwise become surety for any person or persons without the consent of the other partners. Each and every one of the four individuals was required punctually to pay and discharge his or her present or future individual obligations for the purpose of protecting the interests of the business and the other partners therein. A drawing account was authorized and established for each of the four partners and there was nothing in the agreement which in any way restricted the exercise by any one *362 of the four partners of the rights so established. The books of account were required to be always open for inspection by any one of the four individuals named. No partner could dispose of his or her interest without first offering such interest to the other partners. Provision was also made to protect the rights and interests of survivors. There are some of the numerous provisions contained in the partnership agreement quoted in full in our findings of fact, and which, when coupled with the other facts, lead us to the conclusion and the transfer and assignment by Haltiwanger of the specified interests to his wife and two sons was real and actual, that those interests became their own individual property, and that they continued in the business of Haltiwanger's pursuant to the terms of the partnership agreement. The claim of the respondent that Mrs. Haltiwanger was not a partner in the business and that the interest attributed to her was that of Haltiwanger, Sr., is accordingly rejected. Decision will be entered for the petitioner.